UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JUAN JOSE RECINOS,

                Petitioner,

   v.

DONALD HOLBROOK,

                Respondent.

Case No. C15-5401 RBL-KLS

**REPORT AND RECOMMENDATION**
**Noted For:  September 25, 2015**

Petitioner Juan Jose Recinos seeks 28 U.S.C. § 2254 habeas relief from his conviction for two counts of second degree attempted murder, vehicular assault, and failure to remain at an injury accident. Dkt. 1.  He contends that his self-incriminating custodial statements were obtained without proper warnings or a valid waiver, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  *Id.,* at 17.  Respondent contends that the state court's adjudication of the claim was neither contrary to nor an unreasonable application of clearly established federal law.  Dkt. 6

The undersigned recommends **DENYING** the habeas petition.  The undersigned also recommends **DENYING** the issuance of a certificate of appealability.

## BACKGROUND

**A.**    **Facts**

The Washington Court of Appeals summarized the facts in Mr. Recinos's case:

REPORT AND RECOMMENDATION - 1

Juan and Tiffany Recinos were married and lived in Puyallup. Recinos threatened Tiffany that if he ever caught her having an affair, that he would kill them both. In mid-February 2010, Tiffany[1] began a romantic relationship with Arthur DeVone and later that month she spent the night with him. Two days later, Tiffany went to see DeVone at his parents' house. That night, DeVone drove Tiffany's car around Tacoma and Puyallup while Tiffany rode in the passenger's seat. Around 11:30 p.m., Tiffany saw Recinos in the adjacent lane, driving their family minivan. Recinos appeared angry. Suddenly bullets hit Tiffany's car. Then Recinos's minivan collided with the passenger side of the other car. DeVone tried to drive away but Recinos bumped the back of Tiffany's car with the minivan. DeVone accelerated to 90 m.p.h., ran a red light, and collided with two other vehicles. When the car stopped, Tiffany was unconscious. DeVone got out of the vehicle but could not stand because his leg was injured.

Recinos approached DeVone on foot, pointed a gun at his head, cocked it, and told him that he should kill them both. He then hit DeVone's head with the gun and walked away. DeVone, Tiffany, and another driver were hospitalized. DeVone suffered a broken leg and Tiffany underwent six surgeries due to her severe injuries.

Tiffany's mother and stepfather, Teresa and Mark Moreau,[2] also lived in Puyallup. Around midnight that night, Teresa was awakened by Recinos's phone call saying that he was coming to their house. When Recinos arrived, his pants, shoes, and socks were bloody and he told Teresa that he had "found them together" and had shot and T-boned Tiffany's car. 5 Verbatim Report of Proceedings (VRP) at 585. Recinos also told her that their children were home alone, so Teresa grabbed her keys, drove to Tiffany and Recinos's home, and called 911 from her cell phone while driving. Recinos then woke Mark. Soon, the police arrived at the Moreaus' home and arrested Recinos. On February 25, the State filed its initial charges against Recinos: two counts of attempted first degree murder, three counts of first degree assault, three counts of vehicular assault, and one count of failure to remain at the injury accident.

I.   PRETRIAL PROCEEDINGS

Trial was continued five times from the first trial date of July 6, 2010 to February 22, 2011. After pretrial hearings, the jury was called February 28.

Although Recinos's counsel agreed to every continuance, Recinos objected to each one.[3]

At a pretrial CrR 3.5 hearing, Recinos moved to exclude admission of statements he made to Pierce County Sheriff's Deputy Aaron Thompson and Washington State Patrol Detective Julie Gundermann after his arrest. Deputy Thompson explained that he could not remember who but someone advised

REPORT AND RECOMMENDATION - 2

Recinos of his constitutional rights on the night of his arrest. And Recinos invoked his right to remain silent "immediately upon contact." VRP (Feb. 22, 2011) at 14. Deputy Thompson placed Recinos in his patrol car, and transported him, handcuffed, to the incident scene. During the drive, Recinos asked Deputy Thompson "if his wife, Tiffany, was okay." VRP (Feb. 22, 2011) at 16. Deputy Thompson responded that he did not know. Recinos then said that he had learned that his wife was having an affair with "a black man" and asked Deputy Thompson if he had any questions for him. VRP (Feb. 22, 2011) at 16. Deputy Thompson responded that he could not ask any questions because Recinos had invoked his right to remain silent. He then turned Recinos over to the state patrol at the scene of the incident and had no further contact with him.

Detective Gundermann testified that Recinos was transferred to the state patrol, and was placed in the patrol car's back seat still handcuffed. The detective knew that Recinos had been read his rights and she asked if he wanted to give a taped statement. He declined by saying he wanted to speak with an attorney first.

When Recinos asked Detective Gundermann what he was being arrested for and what was happening, the detective told him that there had been a collision and a shooting. Recinos said that he did not know anything about a collision or a gun. After observing an injury to Recinos's right hand, Detective Gundermann asked Recinos if he was injured, Recinos told her that he was not injured. The detective had no further communication with him.

The trial court concluded that Recinos was in custody at the time of his statements to Deputy Thompson and Detective Gundermann, that Recinos's statements were made sua sponte and that they were not the result of police interrogation. Thus, Recinos's statements were admissible.

II. TRIAL

On February 28, the first day of trial, the State filed an amended information, charging Recinos with two counts of attempted second degree murder, two counts of first degree assault, one count of vehicular assault, and one count of failure to remain at the accident scene. Trial testimony was lengthy. DeVone, Tiffany, and the Moreaus testified to the facts as summarized above.[4] Detective Gundermann identified several photographs that showed Recinos in handcuffs. After Recinos's objection, the State argued that the cut on Recinos's hand was relevant. Among others, the court admitted (1) a front view of Recinos's full body seated in the patrol car with his hands behind his back; (2) showing Recinos's hands in handcuffs and a cut on one hand; and (3) showing a closer view of Recinos's hands in handcuffs. The court noted that the photographs supported the State's theory that the mark on Recinos's right hand was a laceration that could have been caused by the firearm's slide action that Recinos used to shoot at his wife's vehicle.

REPORT AND RECOMMENDATION - 3

Christopher Hayes, Recinos's fellow inmate, testified that Recinos had told him that he tried to kill his wife because she was cheating on him, and that Recinos never told him that he was trying to save his wife or that his wife was kidnapped.

Recinos objected to admission of Teresa's 911 call. The 911 caller identified herself as Teresa Moreau. She told the operator that her son-in-law, Recinos, told her that he had shot the guy that her daughter was with and T-boned them in the car. Teresa explained that Recinos arrived at her home, that her husband was also there, that he told them what happened, and that she had just left to go get the kids. Recinos argued that Teresa's statements were inadmissible hearsay and did not qualify as an excited utterance. The State argued that it was an excited utterance considering Teresa's tone of voice, the language used, the call's timing, and that Teresa had firsthand knowledge of what Recinos told her. The court allowed the first two and one-half minutes of the recording to be played for the jury.

Pierce County Corrections Officer James Scollick testified about how the jail recorded inmate's phone calls and that he had recorded and copied several of Recinos's phone calls.

Lastly, Recinos took the stand. Recinos testified that he never threatened to kill Tiffany, he did not suspect that she was cheating on him, and he became worried when she did not return home from work that night so he went looking for her. He testified that when he saw her in her car that he feared she had been kidnapped so he shot at the tires to try to stop the car. Recinos also testified that he accidently rear-ended Tiffany's car twice because he was driving distracted, he was trying to find his cell phone to call the police, and Tiffany's car made two immediate stops and he was not able to brake fast enough. But, he testified that his van never intentionally hit Tiffany's car and that he checked on Tiffany after her car stopped but realized he could not help her so he left the scene concerned about his children who were home alone.

During cross-examination, the State asked Recinos if he remembered a phone call that he made to Jim Landon while in jail. When the State asked Recinos whether he had ever told inconsistent stories about what happened the night of the incident, Recinos answered that he had not. The State then played the phone call's recording that Scollick had earlier identified[5] and asked:

> Mr. Recinos, would you agree with me that we just overheard you telling this individual, Jim—he asked you, I think, directly, Did you ever shoot at them? And you were heard saying no. And, Did you ever shoot at their car? And you were heard saying no?

6 VRP at 767-68. Recinos responded, "That's correct." The State then asks, "And yet a few moments ago you told this jury that you shot four to five times?"

REPORT AND RECOMMENDATION - 4

6 VRP at 768.  Recinos answered, "At the tires."  6 VRP at 768.  Recinos did not object to the State playing the recording or the State's questions.  Referring to Recinos's kidnapping fear theory, the State also asked Recinos, "And yet you chose not to tell anyone about this until today?" 6 VRP at 784.  Recinos responded, "No, that's not true." 6 VRP at 784.

Then, during closing arguments, the prosecutor mentioned Recinos's kidnapping fear theory again.

> Why didn't he tell anybody that? . . .
>
> . . . Why didn't he call 911? . . .
>
> . . . .
>
> When the police were there waiting at the Moreau residence, he didn't tell the police, Whoa, there's been a big misunderstanding here, I was just trying to help, I thought she was kidnapped. . . .
>
> As a matter of fact, ladies and gentlemen, . . . you [are] the first people to hear about it, over a year later . . . . That's the first time the record, the evidence in this case ever indicates anything about a kidnapping, was yesterday.

7 VRP at 865-67.

Outside the jury's presence, Recinos's counsel reported to the court that Recinos still had not received the redacted discovery.  A few days later, Recinos notified the court that he had still not yet received the requested discovery.  The next morning, Recinos's counsel then explained to the court his efforts regarding getting Recinos the discovery: that he had previously sent the transcripts to Recinos to review with the defense investigator, that he had requested redacted copies from the Department of Assigned Counsel for months, and that after the court indicated that Recinos could have unredacted copies, that he had taken them to Recinos.  Recinos told the court that he had received the discovery the night before but that he did not have an opportunity to review all the transcripts.  The court made no further comment.

The jury returned guilty verdicts for all counts and special verdicts that Recinos was armed with a firearm at the commission of the attempted murder and assault convictions.  At sentencing, the State moved to vacate Recinos's two counts of first degree assault.  The court vacated the two first degree assault convictions, explaining that the factual basis for the assault charges was the same as the factual basis for the attempted second degree murder charges.  Also at sentencing, Recinos filed a pro se new trial motion and a relief from judgment

REPORT AND RECOMMENDATION - 5

motion. The court denied both motions and sentenced Recinos.[6]

[2] [State court's footnote] For clarity, we refer to Tiffany by her first name, intending no disrespect.

[3] [State court's footnote] For clarity, we refer to Mark and Teresa in their individual capacity by their first name only, intending no disrespect. We refer to them collectively as the Moreaus.

[4] [State court's footnote] Also, Recinos requested redacted copies of discovery, which he claimed his attorneys had not provided to him. About a month later, he requested the copies again. The Department of Assigned Counsel's assistant director told the court that he would check into the situation.

[5] [State court's footnote] The State also called Detective Gundermann, Deputy Thompson, the two other drivers of the vehicles involved in the accident, two witnesses who observed the accident and the scene, four forensic scientists with the state patrol, and Tiffany's family friend.

[6] [State court's footnote] The record indicates, "(A portion of tape played.)" 6 VRP at 767. Presumably, this was exhibit 138, although the record does not indicate which exhibit number or which portion of the exhibit was played.

Dkt. 7, Exhibit 3, Unpublished Opinion at 2-8; *State v. Recinos,* 177 Wn. App. 1031 (2013).

**B.    Procedural History**

Through counsel and pro se, Mr. Recinos appealed his conviction to the Washington Court of Appeals. Dkt. 7, Exhibits 4 and 5. The court denied his appeal in an unpublished opinion. *Id*., Exhibit 3. Pro se, Mr. Recinos petitioned for review in the state's highest court. *Id*., Exhibit 8. The Washington Supreme Court denied review without comment on April 2, 2014. *Id*., Exhibit 9. The Court of Appeals issued its mandate on May 1, 2014. *Id*., Exhibit 10.

A year later, Mr. Recinos filed a personal restraint petition with the Washington Court of Appeals. *Id*., Exhibit 11. Before the court decided the petition, Mr. Recinos moved to withdraw it. *Id*., Exhibit 12. The court granted the motion and dismissed the petition without prejudice. *Id*., Exhibit 13.

REPORT AND RECOMMENDATION - 6

**EVIDENTIARY HEARING**

The decision to hold a hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v. Pinholster*, ---U.S.---, 131 S.Ct. 1388 (2011). A hearing is not required if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*; *see also Cullen*, 131 S. Ct. 1388 (2011). The Court finds it unnecessary to hold an evidentiary hearing because Mr. Recinos's claims may be resolved on the existing state court record.

**DISCUSSION**

Mr. Recinos contends that his post-arrest statements to police officers violated *Miranda v. Arizona*, 384 U.S. 436 (1966). Mr. Recinos brings his habeas claim pursuant to 28 U.S.C. § 2254(d) (1), which provides that a federal court may not grant habeas relief unless the petitioner establishes that the underlying state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." A state-court decision is "contrary to" clearly established federal law when its conclusion is opposite to that reached by the Supreme Court on a question of law, or its decision is different than a decision of the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405, 120

S.Ct. 1495, 146 L.Ed.2d 389 (2000).  A state-court decision is an "unreasonable application" of clearly established federal law when the state court "identifies the correct governing legal principle" but then unreasonably applies or extends that principle to the facts of the petitioner's case.  *Id*. at 413.  For a federal court to grant habeas relief, it is not enough for a state court to have applied federal law incorrectly or erroneously; rather, the state court's application of federal law must have been "objectively unreasonable ."  *Id*. at 409; see also *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).  Federal law is "clearly established" when the governing legal principle or principles are set forth in the holding of a Supreme Court decision at the time the state court rendered its decision.  *Lockyer*, 538 U.S. at 71–72; *Williams*, 529 U.S. at 412.

The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  This privilege applies in the context of custodial interrogations, *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), and is binding on the states, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).  The police must advise a person taken into custody, or deprived of freedom in any significant way, of his right to remain silent and his right to the presence of an attorney during questioning.  *Miranda,* 348 U.S. at 444.  An individual may waive these rights if the waiver is made voluntarily, knowingly, and intelligently.  *Id*.

A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and is knowing and intelligent if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A waiver may be express or implied, and its existence is determined based on the particular facts and circumstances in the case.  *North Carolina v. Butler*, 441 U.S. 369, 373–75 (1979).  "Only if the totality of the

circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (internal quotation and citations omitted).

Likewise, the statement a suspect makes after he waives his *Miranda* rights must be voluntary to be admissible. A voluntary statement is one that is the product of a rational intellect and free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). No one factor is determinative. Instead, the "totality of the circumstances" must be considered. *Crane v. Kentucky*, 476 U.S. 683 (1986). This includes both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

A state court's subsidiary factual determinations underlying the issue of voluntariness are entitled to a presumption of correctness and its conclusions entitled to great weight. *Miller v. Fenton*, 474 U.S. 104, 112 (1985). However, the ultimate issue of voluntariness raises a legal question requiring independent federal determination. *Id*.

A defendant can invoke his Fifth Amendment right to silence only if he is both in custody and is being interrogated or is about to be interrogated. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other *than* 'custodial interrogation' . . . .").

Once a defendant has invoked his Fifth Amendment right to silence, he cannot be questioned about any crime, charged or uncharged. But if he reinitiates contact with the officials about his crimes, the protection ends. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion).

The Washington Court of Appeals rejected Mr. Recinos's claim that his statements to Deputy Thompson and Detective Gundermann should have been suppressed:

REPORT AND RECOMMENDATION - 9

Recinos argues that the trial court should have suppressed his statements to Deputy Thompson and Detective Gundermann. The trial court did not err because all of Recinos's statements to Deputy Thompson and Detective Gundermann were spontaneous and voluntary and were not the product of interrogation or provocation.

When reviewing a trial court's conclusion of voluntariness, we determine "whether there is substantial evidence in the record from which the trial court could have found that the confession was voluntary by a preponderance of the evidence." *State v. Broadaway*, 133 Wn.2d 118, 129, 942 P.2d 363 (1997). Substantial evidence "exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Recinos first challenges finding of fact 8, which provides that "[t]he defendant then stated to Deputy Thompson that he had just found out that his wife was having an affair with a black guy." Clerk's Papers (CP) at 179. Deputy Thompson's testimony at the CrR 3.5 hearing supports this finding. Deputy Thompson testified that Recinos told him during the drive from the Moreau house to the accident scene that "he had found out that she was having an affair with a black man." 1 VRP at 16. And Deputy Thompson testified that Recinos's statement was not in response to anything Deputy Thompson had said. Thus, a sufficient quantity of evidence exists to persuade a fair-minded rational person of the truth of finding of fact 8.

Next, Recinos challenges the trial court's conclusion of law 2, which provides that "[t]he statements of the defendant were made sua sponte and were not the result of police interrogation." CP at 180. Here, the only question is whether Recinos's statements were the result of an interrogation. Wholly unsolicited statements and statements made in response to words not likely to solicit incriminating information are admissible even in the absence of *Miranda* warnings. *State v. Eldred*, 76 Wn.2d 443, 448, 457 P.2d 540 (1969). Interrogation includes "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Richmond*, 65 Wn. App. 541, 544, 828 P.2d 1180 (1992) (alteration in original) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). Brief, neutral, non-accusatory inquiries do not infringe on a defendant's privilege against self-incrimination. *State v. Lister*, 2 Wn. App. 737, 741, 469 P.2d 597, review denied, 78 Wn.2d 994 (1970).

Deputy Thompson testified that Recinos made two statements to him during the drive from the Moreau house to the accident scene: (1) Recinos asked if his wife was okay and (2) he told Deputy Thompson that "he had found out that she was having an affair with a black man." 1 VRP at 16. Deputy Thompson testified that neither of these statements came in response to anything Deputy Thompson said to or asked of Recinos. Deputy Thompson acted reasonably and

REPORT AND RECOMMENDATION - 10

> did nothing to call for a response from Recinos. The statements were unsolicited and admissible even without *Miranda* warnings. *Eldred*, 76 Wn.2d at 448.
>
> It is also clear that Detective Gundermann did not say any words or take any action that she should know were reasonably likely to elicit an incriminating response from Recinos. After Recinos arrived at the scene, Detective Gundermann approached Recinos in the police vehicle and asked him if he would like to give a taped statement. Recinos told her that he wanted to talk to an attorney first. Then, without any further question or statement from Detective Gundermann, Recinos asked her what he was being arrested for. Detective Gundermann told Recinos that there had been a collision and a shooting. Recinos responded that he did not know anything about a collision or a gun. Finally, after Detective Gundermann observed an injury to Recinos's right hand, she asked Recinos if he had any injuries to his hand. Recinos responded that he did not. Detective Gundermann asked Recinos only brief, neutral, and nonaccusatory inquiries that were not likely to elicit an incriminating response from him and those inquiries did not infringe on Recinos's privilege against self-incrimination. *Lister*, 2 Wn. App. at 741. Thus, Recinos's statements in response were admissible even without *Miranda* warnings.
>
> We hold substantial evidence exists in the record to support the trial court's conclusion that the confession was spontaneous and voluntary by a preponderance of the evidence. Thus, the statements were admissible even without *Miranda* warnings.

Dkt. 7, Exhibit 3, at 11-13.

The record confirms that Deputy Thompson, the transporting deputy, did not ask Mr. Recinos any questions and therefore, did not attempt to elicit any incriminating response from Mr. Recinos. Dkt. 7, Exhibit 14, Verbatim Report of Proceeding, Vol. 1, at 16-17. Instead, the record reflects that during the transport, Mr. Recinos asked Deputy Thompson whether his wife was okay and that he had "found out that she was having an affair with a black man." There is no evidence that these statements were in response to any question or statement by the deputy.

Mr. Recinos contends that when Deputy Thompson also asked him "if he had any other questions for him (4 RP 6) [and that] [t]his indicates that there had been a previous dialogue between Deputy Thompson and Petitioner Recinos." Dkt. 1, p. 38. There is, however, no evidence that Mr. Recinos responded to such a question or evidence showing that the question

REPORT AND RECOMMENDATION - 11

was intended to elicit an incriminating response.

The record also reflects that Detective Gundermann asked no questions of Mr. Recinos that were reasonably likely to elicit an incriminating response. After the Detective asked Mr. Recinos if he wanted to give a taped statement and Mr. Recinos stated he wanted to speak to an attorney first, Mr. Recinos asked Detective Gundermann what he was being arrested for and what was going on. *Id*. at 29. Detective Gundermann responded that there had been a collision and a shooting. *Id*. at 30. Mr. Recinos responded he did not know anything about a collision or a gun. *Id*. When Detective Gundermann noticed he had an injury to his hand, she asked Mr. Recinos whether he had any injuries to his hand and he responded no. *Id.* There were no additional conversation or statements between them. *Id*.

Mr. Recinos contends that Detective Gundermann violated his *Miranda* rights because she initiated a conversation with him even though she knew he had been advised of his constitutional rights and did not want to talk to deputies. However, the record reflects that Detective Gundermann merely asked if Mr. Recinos wanted to make a statement and asked nothing further after he indicated he did not. Detective Gundermann's inquiry was brief, neutral, and non-accusatory.

Mr. Recinos also refers to his trial testimony that Detective Gundermann was upset and "started hammering me with questions: 'why were you trying to kill your wife and boyfriend? Why this? Is that injury from the hammer?' I mean it was a constant interrogation, and I felt it was my right to say I needed an attorney because you already have a misconception of what really happened. (9 RP 785)". Earlier in his testimony Mr. Recinos indicated that he tried to explain his version of what occurred earlier but no one would listen to him. The prosecutor then asked: "Mr. Recinos, you said you wanted to talk, but when Detective Gundermann approached

REPORT AND RECOMMENDATION - 12

you in the back of the car, according to your testimony on direct, I invoke the Fifth, so then you're telling us 'I didn't want to talk but I did want to talk.' Which is it?" The statements at issue are, according to Mr. Recinos, an explanation of why he did not want to talk to Detective Gundermann.  Dkt. 7, Exhibit 19, Verbatim Transcript of Proceedings, Volume 6, p. 785.

The record confirms that at the time Detective Gundermann had approached Mr. Recinos, he had already invoked his right to remain silent. Moreover, no evidence was offered at Mr. Recinos's evidentiary hearing of any statements by Detective Gundermann other than those statements referred to by the Washington Court of Appeals in its decision.  Therefore, Mr. Recinos's claim that the trial court overlooked or ignored his testimony at trial is without merit.

To the extent Mr. Recinos is contending that the Washington Court of Appeals incorrectly summarized the evidence presented at his trial, no insufficiency of evidence claim is asserted in his federal habeas petition.  Moreover, while an appellate court must summarize the facts in writing an opinion, it neither lists all the facts nor limits its analysis to only those facts in that summary.  When evaluating a claim of insufficiency of the evidence to support a conviction, the question is not whether the Court itself believes the evidence establishes guilt. "Instead, the relevant question is whether ... any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Wright v. West*, 505 U.S. 277, 284 (1992).  The Court must "view the record as a whole in the light most favorable to the prosecution." *Gordon v. Duran*, 895 F.2d 610, 612 (9th Cir.), cert. denied, 489 U.S. 1077 (1990).  The jury is entitled to believe the State's evidence and disbelieve the defense's evidence.  *Id*.

Finally, Mr. Recinos contends that at the Rule 3.5 hearing, the Washington trial court

erred when it made no finding that Mr. Recinos had in fact been advised of his *Miranda* rights. However, the Washington Court of Appeals concluded that his statements were voluntary, self-initiated, and spontaneous even in the absence of *Miranda* because he was not being interrogated. Because Mr. Recinos's statements were voluntary and self-initiated, *Miranda* is not relevant.

There is no evidence that Deputy Thompson or Detective Gundermann elicited Mr. Recinos's statements. Mr. Recinos asked the questions, which the officers answered. Neither Deputy Thompson nor Detective Gundermann made any follow up statements or questions that were designed to elicit an incriminating response from Mr. Recinos. The Washington Court of Appeals correctly concluded that his statements were voluntary, self-initiated, and spontaneous even in the absence of *Miranda*. See *Innis*, 446 U.S. at 295 (when suspect told officers where he could find the missing gun after overhearing officers in the front of the patrol car discussing the danger of a little girl finding the missing gun and shooting herself, admission of the suspect's statement did not violate the Constitution because the suspect was not "interrogated" within the meaning of *Miranda* ).

The Washington Court of Appeals' decision upholding admission of Mr. Recinos's statements was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The Court should deny Recinos's petition.

## CERTIFICATE OF APPEALABILITY

If the district court adopts the Report and Recommendation, it must determine whether a certificate of appealability ("COA") should issue. Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A COA may be issued only

REPORT AND RECOMMENDATION - 14

where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court recommends that Mr. Recinos not be issued a COA.  No jurist of reason could disagree with this Court's evaluation of his habeas claim or would conclude that the issues presented deserve encouragement to proceed further.  Mr. Recinos should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

## CONCLUSION

The Court recommends **DENYING** the petition on the merits.  The Court also recommends **DENYING** the issuance of a certificate of appealability.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).   Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **September 25, 2015**, as noted in the caption.

DATED this  8th  day of September, 2015.

Karen L. Strombom
United States Magistrate Judge